IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Paul C. Stepnes,

        Plaintiff,

v.

Peter Ritschel, *et al.*,

        Defendants.

Case No. 0:08-cv-5296 ADM/JJK

**DECLARATION OF ESME MURPHY IN SUPPORT OF THE CBS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Esme Murphy, declare as follows,

1. I am a defendant in this action and submit this declaration in support of the above-referenced motion. I have personal knowledge of the facts set forth below and would be competent to testify to them.

2. I am a reporter for WCCO-TV ("WCCO"), which is owned by CBS Broadcasting Inc., a defendant in this action. I have been employed by WCCO as a reporter for almost 20 years.

3. In approximately June 2008, I learned that Plaintiff Paul Stepnes was sponsoring a contest called the Dream House Giveaway (the "Contest"). In and around that time, I spoke with Jeanette Trompeter, then a WCCO news anchor and colleague, about the Contest. Trompeter had entered the Contest and encouraged me to report about it.

4. At no time did Trompeter tell me that the Irving House was in foreclosure or that Stepnes told her the house was in foreclosure. Nor was I present at a WCCO

morning meeting at which Trompeter apparently "pitched" the idea of WCCO reporting about the Contest.

5. In June 2008, I attempted to contact Stepnes through his spokesperson, to follow-up on a potential news report about the Contest. I was not able to follow through with the news report at that time because I had been assigned to several other investigative news reports that had to be completed.

6. In July 2008, my friend, Jennifer Ryan, and Stepnes, together called me to discuss a potential story relating to the Contest. When I spoke with Stepnes directly by telephone, he asked me to do a story about the Irving House and the Contest.

7. In connection with my reporting for the story, I reviewed the Contest Website and obtained from publicly available records certain documents evidencing that the Irving House was in foreclosure and that it was encumbered by liens totaling more than $150,000. *See* public records documents (attached as Exhibit A).

8. I also reviewed certain press accounts reporting on the controversy surrounding Stepnes's unusual contest; the MPD's assertions that the contest was illegal; and Stepnes's claim that it was not.

9. I conducted video interviews of Edward A. Bock, Jr., Hennepin County Examiner of Titles, and Sgt. Peter Ritschel of the MPD, *see* transcript of interview (attached as Exhibit B); and conducted a telephone interview of Tom Barrett, Executive Director of the Minnesota Gambling Control Board.

10. During his interview, Sgt. Ritschel told me that a contestant had won a weekly prize and gave me a copy of a screen shot of the Contest Website announcing that

the contestant had won the prize. *See* Contest Website screen shot (attached as Exhibit C).

11. I interviewed Greg Strzelecki, the contestant who had been identified on the Contest Website as the winner of the May 18, 2008 weekly prize, at his home. Strzelecki told me that no one had contacted him regarding his prize; that he understood the proceeds from the contest would all go to charity; and that he was surprised to learn the Irving House was in foreclosure. *See* DVD of Broadcast (previously filed as Doc. 49-14); transcript of Broadcast (attached as Exhibit D).

12. In the course of my reporting, I also contacted the Secretary of State's Office, the Charity Review Council, and the Minnesota Attorney General regarding the registration of the Chester House Foundation. I learned that any entity soliciting funds from the public had to be a registered charity. I learned further that Chester House Foundation was not registered with either the Secretary of State's Office, the Charity Review Council or the Minnesota Attorney General.

13. I spoke with public affairs officers for the Minneapolis Police Department and Minneapolis City District Attorney's Office and discussed the contests with individuals who had toured the property or purchased an entry in the contest.

14. I also arranged an interview with Stepnes, which was delayed to accommodate the insistence by his attorney, Jill Clark, to be part of the interview.

15. I interviewed Stepnes and Clark on July 15, 2008.

16. The report was Broadcast on WCCO on July 15, 2008, during its 10:00 p.m. newscast, and an article substantially similar to the Broadcast was posted on WCCO's website the same day (attached as Exhibit E).

17. The Broadcast reported that in light of the declining housing market sellers in the Twin Cities were "getting creative," and discussed Stepnes's contest as an example of that creativity. Exhibit D.

18. I reported Stepnes's claims that the contest was "a mathematical and analytical skill contest" and the MPD's assertions that the contest was illegal. Exhibit D.

19. I also reported on certain statements on the Contest Website. Specifically, I noted that the Contest Website discussed raising money for the homeless and identified Chester House Foundation in connection with those statements. I noted that Chester House Foundation was not a registered charity in the state of Minnesota. Exhibit D.

20. At the time of the Broadcast, I understood that Chester House Foundation was not a registered charity in the State of Minnesota. Exhibit D.

21. I reported that I had found public documents reflecting that the Irving House was in foreclosure and encumbered by more than $160,000 in liens. Exhibit D.

22. The Broadcast also included portions of my interview with Stepnes and Clark. *See* Exhibit D. I asked them how Stepnes could give away the Irving House in November if he could lose the home in September. Stepnes did not deny that the home had to be redeemed by September. I understood that there was a possibility that Stepnes could lose the home and reported Clark's prediction that either the contest would make enough money by the redemption date or a benefactor would step in to redeem the house.

23. The Broadcast included portions of my recorded interview of contestant Greg Strezlecki.

24. I understand Stepnes contends that a statement in the Broadcast that "the only place this man could be moving is to jail" communicated to viewers that Stepnes had been convicted and sentenced to jail for not sharing contest proceeds with the homeless. I did not intend any such implication. Indeed, I reported Stepnes's counsel's observation that he had *not* been charged with any crime. See Exhibit D.

25. I also understand that Stepnes contends that the following two statements in the Broadcast are defamatory:

> Stepnes says he never called Greg to let him know he won the microwave because of his arrest.
>
> He was released within a few hours.

Exhibit D.

26. I further understand that Stepnes alleges the foregoing statements, taken together, imply that he was falsely claiming that he could not contact the winner of the microwave because he was confined in jail even though he had been released within a few hours. I did not intend to convey such an implication. Rather, I intended to communicate information about two separate issues: (1) Stepnes's explanation for not contacting the microwave winner; and (2) Stepnes's release from jail. At the time the Broadcast aired, I understood both statements were true.

27. At the time I prepared the Broadcast, I believed that every fact that I included in it was entirely accurate. I did not knowingly include any fact in the

5

Broadcast that I knew to be false or about which I entertained any serious doubt. When I prepared the Broadcast and when WCCO aired it on July 15, 2008, I believed that the facts reported in it were true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6 day of September 2010 in Minneapolis, Minnesota.

Esme Murphy