# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Paul C. Stepnes,

        Plaintiff,

      v.

Peter Ritschel, individual capacity;
Jane Moore, individual capacity;
City of Minneapolis; CBS Broadcasting, Inc.,
foreign corporation; and Esme Murphy,
individual;

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 08-5296 ADM/JJK

_____

Jill Clark, Esq., Jill Clark, PA, Golden Valley, MN, on behalf of Plaintiffs.

James Anthony Moore, Esq., and Sara J. Lathrop, Esq., Assistant Minneapolis City Attorneys, Minneapolis, MN, on behalf of Defendants Peter Ritschel, Jane Moore, and City of Minneapolis.

Jeanette Melendez-Bead, Esq., Michael D. Sullivan, Esq., and Chad R. Bowman, Esq., Levine Sullivan Koch & Schulz, LLP, Washington, D.C.; John P. Borger, Esq., and Mary Andreleita Walker, Esq., Faegre & Benson, LLP, Minneapolis, MN, on behalf of Defendants CBS Broadcasting Inc., and Esme Murphy.

_____

## I. INTRODUCTION

On October 20, 2010, the undersigned United States District Judge heard oral argument on Plaintiff Paul C. Stepnes' ("Stepnes") Motion for Partial Summary Judgment [Docket No. 309], Defendants Peter Ritschel and City of Minneapolis' (collectively, "City Defendants") Motion for Summary Judgment [Docket No. 312], and Defendants CBS Broadcasting, Inc. and Esme Murphy's ("Murphy") (collectively, "CBS Defendants") Motion for Summary Judgment [Docket No. 315]. For the reasons set forth below, the City Defendants and CBS Defendants' motions are granted. Plaintiff Stepnes's motion is denied.

## II. BACKGROUND[1]

In an effort to redeem a house he built called the "Irving House," Stepnes, a real estate developer, devised a "home giveaway" contest. Shortly after the contest began in May 2008, Sergeant Peter Ritschel ("Ritschel") of the Minneapolis Police Department ("MPD") arrested Stepnes for illegal gambling and searched the Irving House for evidence of an unlawful lottery. On July 15, 2008, the CBS Defendants aired a newscast that reported on the home giveaway contest and Stepnes's arrest for gambling law violations.

Stepnes has advanced multiple claims against the City Defendants[2] under 42 U.S.C. § 1983 for failure to conduct a non-neutral investigation, false arrest, excessive force, illegal search and seizure, and conspiracy to violate Stepnes's constitutional rights. Additionally, Stepnes has brought a defamation claim against the CBS Defendants, alleging that the broadcast included numerous defamatory statements and that the overall broadcast portrayed Stepnes as a criminal.

### A.    Irving House

Stepnes is a real estate developer who purchases, restores and resells homes. 1st Am. Compl. ("Compl.") [Docket No. 2] ¶ 10; Sullivan Decl. [Docket No. 321] Ex. 1 ("Stepnes Dep.") at 34-35. Stepnes built a "new old home," equipped with modern amenities yet architecturally designed to blend with the older homes in the neighborhood, at 2857 Irving Avenue South in

_____

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). As both parties have moved for summary judgment, any disputed facts are noted.

[2] Stepnes initially included Jane Moore, also known as Jane Moore Emberley ("Emberley") as a City Defendant, however the claims against Emberley were orally withdrawn by Stepnes's counsel at the summary judgment hearing.

Minneapolis, Minnesota (the "Irving House"). Compl. at ¶ 10-11. Stepnes financed the Irving House through a number of loans. Compl. at ¶ 8; Sullivan Decl. Ex. 2 ("1st Stepnes Aff.") ¶ 9. He attempted to sell the Irving House in 2005 for $2,250,000. 1st Stepnes Aff. ¶ 7. Stepnes declined a purchase offer of $1.8 million. Compl. ¶ 12. Ultimately, he was unable to sell the Irving House for its sought-after price, and the house went into foreclosure. Compl. ¶¶ 12-13; Sullivan Decl. Ex. 7 at 2.

**B.      Contest 1**

In an effort to raise money to redeem the Irving House and pay creditors, Stepnes designed a "Big Dream House Giveaway" contest. Compl. ¶¶ 15, 18-25; Clark Decl. [Docket No. 327] Ex. 22. A website promoting the contest stated that a goal of the contest was to aid the homeless by paying off the mortgage of a shelter for homeless women and children. Compl. ¶ 18; Clark Decl. Ex. 22.

The contest rules provided that contestants pay $20 for an opportunity to guess the number of nails, bolts, and screws (collectively, "fasteners") contained in a large antique chest ("Contest 1"). Compl. ¶ 25; Moore Decl. [Docket No. 324] Ex. 1 at 2. Stepnes sought to collect $5 million in entry fees. Compl. ¶ 26. The contestant guessing the closest number of items in the chest without going over would be the winner of the contest. Moore Decl. Ex. 1 at 2. If over 250,000 entries were sold, the winner could choose either the Irving House or $1 million. Moore Decl., Ex. 1 at 7. If less than 250,000 entries were sold, the winner was entitled to 50% of "the balance of the funds left after paying all prizes, all contest expenses, and all expenses for the [Irving] House." Id. Contest 1 also included weekly drawings "for an additional prize." Id. at 1. If the contest did not result in sufficient income to redeem the Irving House by the redemption

date, Stepnes alleges he had arranged for an anonymous benefactor to "to step in."  Compl. ¶ 15.

In April 2008, prior to launching Contest 1, Stepnes sought advice regarding state gambling regulations from Tom Barrett, the Executive Director of the Minnesota Gambling Control Board ("MGCB").  Compl. ¶ 22; Moore Decl. Ex. 6 ("Stepnes Dep.") at 249-52; Id. Ex. 11 ("Barrett Dep.") at 70-72.  At the meeting, Barrett explained to Stepnes that Minnesota law defines gambling as the presence of three elements:  consideration, chance, and a prize.  Compl. ¶ 22.  Barrett advised Stepnes that "one way to remove the element of 'chance' was to host a game of skill."  Id.  He told Stepnes that because a guessing contest requires analytical skill,  the element of chance is removed from the contest.  Barrett Dep. at 27-31.  Barrett "gave the green light to the concept of having a container filled with nuts and bolts to be used as the determining factor" in the contest.  Id. at 84-85.  Stepnes did not request and did not receive a formal written opinion from Barrett.  Compl. ¶ 22; Barrett Dep. at 84.  Stepnes recalls informing Barrett that the contest would include a weekly drawing for a prize, but that no consideration would be required to enter the weekly drawing.  Stepnes Dep. at 251-52.  Barrett does not recall discussing a weekly drawing and remembers being surprised to learn after the meeting that Contest 1 included a drawing.  Barrett Dep. at 32-33.

Stepnes implemented Contest 1 by borrowing an antique chest and filling it with different nuts, bolts, screws, nails, and other fasteners.  Stepnes Dep. at 80-84.  Before pouring the hardware into the chest, he placed a plastic drop cloth into the chest to protect it from damage.  Stepnes Dep. at 85; Moore Decl. Ex. 12 ("Kwiecien Dep.") at 24-25.  To stabilize and disburse its contents, Stepnes placed a cardboard box into the middle of the chest, underneath the plastic.  Stepnes Dep. at 85-86; Kwiecien Dep. at 25.  The cardboard box was larger than a shoe box and

was partially filled with spools of nails.  Stepnes Dep. at 85-86; Kwiecien Dep. at 25.  Stepnes

did not count the number of items he poured into the chest.  Moore Supplemental Decl. Ex. 4

(Clark Supplemental Aff.) at 1-2.

Stepnes promoted Contest 1 by:  hiring a media consultant, purchasing advertising,

seeking media coverage, hiring a website designer to create a website, posting a sign in the

Irving House yard advertising Contest 1, and posting a sign on the door of the Irving House that

stated:

> $20 FEE GAINS YOU ENTRY INTO THE HOUSE AND
> CONTEST, YOU WILL BE AUTOMATICALLY REGISTERED
> FOR OUR WEEKLY PRIZES.
>
> YOUR PARTICIPATION WILL HELP FUND THE
> CHESTERHOUSE FOUNDATION.  OUR GOAL IS TO RAISE
> $1.5 MILLION TO HELP FUND ORGANIZATIONS THAT HELP
> HOMELESS PEOPLE.
>
> IF YOU WISH TO SEE THE HOUSE BEFORE PAYING THE
> ENTRY FEE, PEASE VISIT OUR WEBSITE
>
> 2857IRVING.COM
>
> RING BELL FOR ENTRY!

 Sullivan Decl. Ex. 21; Moore Decl. Ex. 14 ("Aberman Dep.") at 14; Stepnes Dep. at 51.

The contest website provided a photograph of the antique chest filled with items, and

described "the box measurements of the chest containing the materials" as "39 ½" wide by 15"

deep and 12" high . . . There is a wide variety of nails, bolts, nuts, washers and screws ranging

from . . .  spikes down to small finishing brads.  You must use your skills of analysis and

mathematics to determine the number of items in the chest."  Moore Decl. Ex. 1 at 2-3.  The

description did not mention that a box and plastic sheet were also inside the trunk.  <u>See</u> <u>generally</u>

id.

The website also advertised the Chester House Foundation's goal of raising $1.5 million "to pay off the mortgage of a shelter for homeless women and children." Sullivan Decl. Ex. 22. The website does not inform visitors that the $1.8 million dollar home is in foreclosure. Id. The Chester House Foundation is not a registered nonprofit entity or business organization in Minnesota. Pl.'s Mem. of Law in Supp. of Summ. J. [Docket No. 326] at 18; Pl.'s Mem. of Law in Opp. to Summ. J. [Docket No. 346] at 6. Stepnes states that he formed Chester House Foundation as a sole proprietorship, and thus no formal organizational filing was required. Pl.'s Mem. of Law in Opp. to Summ. J. at 6.

## C.     Arrest

On May 28, 2008, a citizen telephoned Ritschel and told him Stepnes may be conducting an illegal raffle. Moore Decl. Ex. 15 ("Ritschel Dep.") at 9, 15-16, 19. In response to the phone call, Ritschel reviewed the contest website and printed several pages, including photographs of the antique chest, information about the Chester House Foundation, a description and photos of the Irving House, and the contest rules. Id. at 19-20, 23-24, 33-34. The contest rules and regulations stated that "[e]arly entry purchases will be included in up to six weekly drawings." Moore Decl. Ex. 1 at 19. The website stated that a contestant had been awarded a microwave oven as a prize from the weekly drawing. Ritschel Dep. at 24. Based on his review of the website, Ritschel "determined that at least half of the contest was a weekly drawing that had no skill connected to it." Id. at 29.

Later that morning, Ritschel, accompanied by Sergeant Emberley, went to the Irving House to further investigate and "get Mr. Ste[p]nes to cease his unlawful activities." Id. at 37;

Moore Decl. Ex. 16 ("Emberley Dep.") at 9-10. The officers did not have a warrant. Compl. ¶ 29. When the officers arrived at the Irving House, they observed the sign on the door advertising the contest and instructing readers to ring the bell for entry. Ritschel Dep. at 46; Emberley Dep. at 9, 15. The officers rang the bell, knocked on the front door, and entered the house. Ritschel Dep. at 46; Emberley Dep. at 16. Stepnes was in the back of the house with publicist Carol Aberman ("Aberman") and a reporter from the Southwest Journal who was interviewing Stepnes about Contest 1. Compl.¶ 28; Stepnes Dep. at 274-75. Aberman went to the front of the house to see who was at the door, and observed the officers entering. Aberman Dep. at 50-51. Aberman states that she requested they wait while she went to get Stepnes, but that they followed her to the back of the house. Id. at 52-53. Ritschel contends Aberman guided them to the back of the house. Ritschel Dep. at 49.

Stepnes confronted the officers in the foyer between the kitchen and the family room. Stepnes Dep. at 276. Ritschel informed Stepnes he believed Stepnes was conducting an illegal gambling operation at the Irving House. Id. Stepnes responded that he had consulted with Senator Dibble and Tom Barrett of the MGCB, who had "worked out a way that [Stepnes] could do this." Id. Ritschel replied, "what do they know?" and asked Stepnes for his driver's license. Id. at 277. Stepnes refused and asked Ritschel to leave the house. Ritschel then informed Stepnes he was under arrest and handcuffed him. Id. Stepnes avers Ritschel pulled the handcuffs so tightly that they cut into his wrists. Id. at 277-78. Stepnes was transported to jail, where he was booked for unlawful gambling under an inapplicable statutory citation. Moore Supplemental Decl. Ex. 2 ("Clark Aff. in Supp. of Emergency Mot.") Ex. E (Booking document specifying offense as "PC GAMBLE" and statutory citation as "609.735?"). He was released a

few hours later.  Compl. ¶ 40.

**D.     Search and Seizure**

The next morning, May 29, 2008, Ritschel spoke with Barrett at the MGCB about
Barrett's meeting with Stepnes.  Ritschel Dep. at 134; Barrett Dep. 41-42.  Barrett told Ritschel
that he conveyed his opinion to Stepnes that determining the number of nuts and bolts in a
container was not gambling because the game involved skill and thus eliminates the element of
chance.  Barrett Dep. at 42.  When Ritschel asked Barrett whether he was aware that the contest
also included a weekly drawing, Barrett responded that he was not told about the weekly
drawings, and "said to Mr. Ritchel then the element of the gamble is now present."  Id.

The same day, Ritschel also applied for and obtained a search warrant for the Irving
House, allowing the seizure of property related to an unlawful lottery and the Chester House
Foundation.  Clark Decl. Ex. 14.  The warrant application included information Ritschel had
learned from the contest website and local news articles, but did not reference Ritschel or
Stepnes's conversations with Barrett.  Moore Decl. Ex. 5.

The Minneapolis Police Department (MPD) executed the search warrant on May 29,
2008 and seized *inter alia*: the sign that had been posted on the front of the door, a newly
purchased and still unpackaged digital recorder, a camera with pictures relating to Stepnes's
arrest, and the antique chest filled with hardware.  Compl. ¶¶ 47-50.  Stepnes was placed in the
back of a squad car during the search.  Id. ¶ 45.  When the officers lifted the antique chest to
remove it, nails and other items began spilling from a crack in the bottom.  Id. ¶ 49; Kwiecien
Dep. at 14-18.  Although the MPD attempted to retrieve the spilled items, the officers were not
certain that all the nails and other fasteners had been accounted for.  Compl. ¶ 49; Kwiecien Dep.

at 14-18.

**E.     State Court Proceedings**

The following morning, May 30, 2008, Stepnes filed an emergency motion in Hennepin County District Court ("State Court") demanding return of the seized items. Compl. ¶ 51; Moore Supplemental Decl. Ex. 1 (Emergency Mot.). The motion was accompanied by an affidavit from Stepnes's counsel, attorney Jill Clark, alleging 1) that the MPD had seized items Stepnes intended to use as evidence in a false arrest case to be filed against Ritschel, and 2) that at the time the items were seized, the MPD prevented Stepnes's counsel from viewing them and comparing them to the search warrant. Id. Ex. 2 (Clark Aff.).

A hearing was held that afternoon. See Moore Supplemental Decl. Ex. 3 (Transcript of proceedings held May 30, 2008). At the hearing, the City Defendants requested ten additional days to respond. Id. at 17. The Honorable Charles A. Porter, Jr. viewed the situation as an emergency, expressed concern that the scope of the search warrant had been exceeded, and gave the City Defendants until June 2, 2008 to prepare an inventory of the seized items and ensure each of the seized items was legitimately taken. Id. at 19-20.

At the June 2, 2008 hearing, Judge Porter determined that the officers involved in the search of the home "went in there with the intent to shut the project down, and they did." Id. Ex. 6 (Transcript of proceedings held June 2, 2008) at 9. Judge Porter ordered the MPD to return the property after photographing the seized items for use as evidence. Id. at 28-37. Judge Porter also informed the MPD that they could copy Stepnes's computer hard drive information, but were not permitted view the information until after Judge Porter had an opportunity to conduct

an *in camera* review for potential attorney-client privileged information.[3]  Id. at 29-30, 37.

## F.     Media Reaction

Following Stepnes's arrest, local news sources published articles about the contest and Stepnes's arrest.  The Southwest Journal reporter who had been present during the arrest posted an online article describing the arrest and police allegations that the contest was an illegal raffle. Sullivan Decl. Ex. 29.

MinnPost.com also reported that Stepnes was arrested for holding an illegal raffle.  Id. Ex. 31.  The MinnPost article related Stepnes's contention that state officials had "signed off"on his plan and that the game was not a game of chance because it involved skill.  The article included Barrett's view that Stepnes's plan had changed to include weekly drawings.  Id.

The MPLS Mirror carried a two-part series of online articles entitled Killing the Dream. Id. Ex. 33, 36.  Part I described Stepnes's eagerness to discuss his situation with the reporter, and detailed Stepnes's allegations of police misconduct relating to his arrest and the execution of the search warrant.  Id. Ex. 33.  Part II again described Stepnes's willingness to discuss his situation. In the article, Stepnes said "this contest of skill could be a 'win-win' for everyone," voiced his

---

[3] Ultimately, technical difficulties prevented Judge Porter from reviewing the hard drive information.  See Report and Recommendation, Feb. 18, 2010 ("Feb. 18, 2010 R&R"), [Docket No. 171] at 5.  In November 2008, contrary to Judge Porter's June 2, 2008 verbal order, Ritschel gave permission to an MPD crime lab examiner to review Stepnes's hard drive information.  Id. at 5-6.  In the instant federal litigation, Stepnes sought to have Ritschel's answer stricken and default judgment entered against Ritschel as a sanction for violating Judge Porter's order.  Pl.'s Mot. to Strike Answer [Docket No. 103].  Judge Keyes denied Stepnes's request, finding that Ritschel's misconduct did "not relate to the matters in controversy in this case – i.e., his . . . violation of Judge Porter's order ha[d] nothing to do with whether [Stepnes] suffered a false arrest in violation of his Fourth Amendment rights."  Id. at 15.  However, Judge Keyes did require Ritschel to pay attorney fees incurred by Stepnes in the federal litigation as a sanction for Ritschel's "serious misconduct" in violating Judge Porter's order.  Feb. 18, 2010 R&R at 15-16.

suspicion that police knowingly compromised the contest under the erroneous belief it was gambling, and "discussed openly" his assurances that "sweepstakes contributors" would not be taken advantage of or victimized as a result of the police action. Id.

A June 4, 2008 newspaper article in the Minneapolis Star Tribune stated that while the contest website announces proceeds "would benefit the Chester House Foundation, paying off a mortgage on a shelter for homeless women and children," . . . "no such non-profit is listed by the Minnesota secretary of state's office." Id. Ex. 37. The article included the MPD's view that the contest constituted illegal gambling, and discussed Stepnes's contentions that the contest was legal because the guessing game involved skill and the weekly drawings were free to enter.

The Southwest Journal posted a second article on June 26, 2008 after Stepnes launched a second version of the Big House Giveaway contest. Compl. ¶ 69; Sullivan Decl. Ex. 39. The article "told Stepnes's side of the story, [and] even added Stepnes's side of the story to some allegations that had been made" in the first Southwest Journal article. Comp. ¶ 69. The second article explained the reasons Stepnes believed Contest 1 was not illegal gambling, discussed Stepnes's view that the MPD caused Contest 1 to fail, described the second contest, and communicated Stepnes's plan to donate some of the second contest's proceeds to housing-related charities. Sullivan Decl. Ex. 39.

**G.     Contest 2**

Following the MPD's search of the Irving House, Stepnes cancelled Contest 1, finding it was no longer viable because items had been spilled from the chest. Compl. ¶ 58; Sullivan Decl. Ex. 37. Stepnes attempted a second contest ("Contest 2") to pay creditors, redeem the Irving House, and give philanthropically to the homeless. Id. ¶ 65. He hired a new public relations

firm and created new advertising. Compl. ¶ 68. Contest 2 required participants to guess the number of items in a glass aquarium filled with "a wide variety of nails, bolts, nuts, washers and screws ranging from 10" spikes down to small finishing brads." Bailey Decl. [Docket No. 263] at ¶¶ 3-4. Unlike Contest 1, Contest 2 did not include weekly prize drawings. Compl. ¶ 66.

## H.    WCCO Broadcast

In June or early July, Stepnes learned that Murphy was reporting a story about Contest 2 on WCCO. Compl. ¶ 73, Murphy Decl. [Docket No. 320] at ¶¶ 5-6. Against the advice of his public relations firm, Stepnes provided Murphy an interview because his "gut" was that Murphy "wanted to hear [his] side of things," and that the "ratings were high on [that] station." Sullivan Decl. Ex. 42.

The broadcast aired as the lead story for the 10 p.m. news on July 15, 2008. Compl. ¶ 97. The report explained Stepnes's attempt to sell 250,000 chances to win the Irving House. Katch Decl. [Docket No. 318] Ex. A. "At twenty dollars apiece, that's a cool five million dollars. The homeowner says he'll share that money with the homeless. But as Esme Murphy explains, police say the only place that man [Stepnes] could be moving is to jail." Id. at 0004-0005. The broadcast reported contestants could win the home by guessing the number of items in a glass container, and showed Stepnes explaining that the contest was a game of mathematical and analytical skill. Id. at 0006. The broadcast stated that police "arrested Stepnes for violating charitable gambling laws," and quoted Ritschel as stating, "[y]ou are paying compensation for a chance to win a prize of cash value." Id. The broadcast related the contest's stated goal of raising money for the homeless through the Chester House Foundation, and informed viewers the foundation is not a registered charity in Minnesota. Id. 0006-07. Murphy also stated that she

"dug a little deeper" to find that the Irving House was in foreclosure. Id. at 0007. The broadcast showed Stepnes's counsel explaining that if the contest did not raise enough money to redeem the house by the redemption date, a benefactor would step forward. Murphy related Stepnes's attorney's opinion that "the arrest was an abuse of police power" and that "Stepnes has not been charged with any crime." Id. at 0009. The broadcast concluded by stating the Minneapolis City Attorney's Office was investigating the situation but declined to comment. Id.

On July 19, 2008, Stepnes decided to shut down Contest 2. Compl. ¶ 114. This lawsuit followed.

## I.    Punitive Damages Denied

After the close of discovery, Stepnes sought to amend the First Amended Complaint to assert punitive damages against the CBS Defendants on his claim for defamation. Pl.'s Mot. to Compel Discovery and Mot. to Add Punitive Damages [Docket No. 193]. Magistrate Judge Keyes denied the motion, finding that the unrebutted evidence presented by Stepnes failed to support a *prima facie* showing that "the CBS Defendants had knowledge of facts or intentionally disregarded facts that create a high probability that the July 15, 2008 story communicated false statements that would tend to harm Stepnes's reputation or lower his esteem in the community." Order, April 13, 2010 [Docket No. 247] at 12-13. The ruling was affirmed by this Court on the merits. Mem. Opinion and Order, June 16, 2010 [Docket No. 257] at 5-6.

## J.    Dismissal of Non-Stepnes Plaintiffs and Tortious Interference Claims

Initially, the Complaint included plaintiffs who had purchased contest entries (the "Contestant Plaintiffs") and plaintiffs who were owed money from Stepnes under a promissory note secured by the Irving House (the "Lender Plaintiffs") (collectively, the "Non-Stepnes

Plaintiffs"). Compl. at ¶¶ 130-134. The Non-Stepnes Plaintiffs alleged claims against Ritschel

and the CBS Defendants for intentional interference with a contract. Count III of the Complaint

alleged the Contestant Plaintiffs entered into a contract with "The Project," and that the

Defendants' intentional, unjustified interference with the contract harmed the Contestant

Plaintiffs because they were deprived of an "an opportunity to win a significant prize." Compl.

¶¶ 131-32. The Complaint further alleged the Lender Plaintiffs entered into a contract (a

promissory note secured by a mortgage) with Stepnes and that the Lender Plaintiffs were harmed

by the Defendants' intentional, unjustified interference with the contract because the Lender

Plaintiffs' loans remained unpaid by Stepnes. Compl ¶¶ 133-34. The Complaint does not allege

that Stepnes suffered damage caused by the Defendants' intentional interference with contract

asserted in Count III.

The Non-Stepnes Plaintiffs later stipulated to dismissal of their claims. See Order

Dismissing Claims [Docket No. 307]. Because the claims were alleged only on behalf of the

Contestant and Lender Plaintiffs, Count III was effectively dismissed upon dismissal of the Non-

Stepnes Plaintiffs.

Accordingly, Stepnes's remaining claims are those against the City Defendants for failure

to conduct a non-neutral investigation, false arrest, excessive force, unreasonable search and

seizure, and conspiracy to violate Stepnes's constitutional rights; and against the CBS

Defendants for defamation.

## III. DISCUSSION

### A.    Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Section 1983 Claims Against City Defendants**

 "Section 1983 imposes liability for certain actions taken 'under color of' state law that deprive a person 'of a right secured by the Constitution and laws of the United States.'"  Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005), (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982)).

**1.      Non-Neutral Investigation**

Stepnes's claim that his rights were violated by a non-neutral police investigation cannot survive the City Defendants' motion for summary judgment.  A state retains broad discretion in deciding who should be investigated for violating the criminal laws.  Flowers v. City of Minneapolis, 558 F.3d 794, 798 (8th Cir. 2009).   "A police officer's decisions regarding whom to investigate and how to investigate are matters that necessarily involve discretion," and such decisions are "subject to traditional class-based equal protection analysis [and] . . . may not be

attacked in a class-of-one equal protection claim." Id. at 799-800.[4]

Stepnes has alleged no facts to show the investigation was motivated by membership in a protected class. Moreover, as explained below, the evidence shows Ritschel's investigation was based on probable cause to believe that Stepnes was conducing an illegal lottery, and further investigation by Ritschel would not have eroded the probable cause. As such, Stepnes's claim for a non-neutral police investigation fails.

### 2. False Arrest

Stepnes claims that Ritschel deprived him of his Fourth Amendment right to be free from unreasonable searches and seizures by arresting him on May 28 and May 29, 2008 without a warrant and without probable cause. The City Defendants argue that they are entitled to summary judgment on the false arrest claim because Stepnes's arrest on May 28, 2008 was based on probable cause, and the Stepnes's brief detention on May 29, 2008 did not constitute an arrest.

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008). "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004). Probable cause is evaluated from the perspective of a

---

[4] A class-of-one equal protection claim is a claim that the plaintiff was treated differently than others who were similarly-situated to the plaintiff, and that there was no rational basis for the different treatment. Flowers, 558 F.3d at 799. Even if the Eighth Circuit were to recognize such a claim in the context of police investigative decisions (which it does not), Stepnes has presented no facts to show he was treated differently than others similarly situated.

reasonable person in the place of the officer.  Id.  "Officers are not required to conduct a mini-trial before making an arrest, but probable cause does not exist when a minimal further investigation would have exonerated the suspect."  Amrine, 522 F.3d at 832 (internal quotations omtted).[5]

### a.    May 28, 2008 Arrest

The facts known by Ritschel at the time of the May 28, 2008 arrest were sufficient to allow a prudent person in Ritschel's position to believe Stepnes had committed the offense of conducting an illegal lottery.[6]  At the time of the arrest, Ritschel had: 1) received a phone call alleging that Stepnes was conducting an illegal lottery; 2) investigated the contest website and found that the contest was described as a "raffle" requiring a $20 entry fee and including weekly drawings for prizes of monetary value; 3) noted from the website that a prize of value – a microwave – had in fact been awarded; 4) observed the sign on the Irving House door stating a $20 entry fee makes contestants eligible for weekly prizes; and 5) spoken with Stepnes, whose

---

[5] Additionally, in Minnesota, a peace officer may arrest without a warrant if, in the presence of the officer, a public offense has been committed or attempted, or if it is reasonably apparent that further criminal conduct will occur.  See Minn. Stat.§ 629.34, subd. 1(c)(1) (providing that  a peace officer may arrest without a warrant "when a public offense has been committed or attempted in the officer's presence); Minn. R. Crim. P. 6.01, subd. 1(a)(3) (permitting a peace officer to make a warrantless arrest in a misdemeanor case if "it reasonably appears . . . further criminal conduct will occur").

[6] Conducting an illegal lottery is a gross misdemeanor in Minnesota.  Minn. Stat. § 609.76, subd. 1(1),(3).  Under Minnesota law, "a lottery exists if (1) a prize or reward is offered, (2) chance determines who is awarded the prize, and (3) participants pay consideration for the chance to win the prize."  Minnesota Souvenir Milkcaps, LLC v. State, 687 N.W.2d 400, 403 (Minn. Ct. App. 2004).  Contests 1 and 2 constituted illegal lotteries because:  1) the prize was the Irving House or half the contest proceeds; 2) chance determined who would be awarded the prize, see n.10, infra; and 3) participants paid $20 as consideration for the chance to win the prize.

insistence that Contest 1 was legal led Ritschel to believe that Stepnes would continue with the lottery. Moore Decl. Ex. 15 (Ritschel Dep.) at 8-12, 19-20, 23-24, 46, 59, 76. The totality of these circumstances would lead a reasonable person to believe that, despite Stepnes's insistence to the contrary, an illegal lottery was being conducted at the Irving House. Therefore, Stepnes's arrest was based on probable cause and did not violate his Fourth Amendment rights.

Stepnes argues that he was arrested for his speech, because he proclaimed his innocence as Ritschel arrested him. However, even if Stepnes's speech had been Ritschel's subjective motive in arresting him, the arrest was nevertheless valid because probable cause had already been established under the existing circumstances. See Foster v. Metropolitan Airports Comm'n, 914 F.2d 1076 (8th Cir. 1990) (finding where probable cause for an arrest was established, officer's subjective motive in arresting plaintiff was irrelevant).

Stepnes also urges that prior to arrest, Ritschel was required to further investigate Stepnes's statements about meeting with Barrett at the MGCB. However, probable cause had already been established, and further investigation would not have exonerated Stepnes. When Ritschel phoned Barrett the day after the arrest to inquire about his meeting with Stepnes, Barrett was surprised to learn of the contest's weekly drawings and told Ritschel "the element of the gamble is now present."

Based on trustworthy information, Ritschel had probable cause to reasonably believe that Stepnes was conducting an illegal lottery at the Irving House on May 28, 2008. Ritschel's arrest of Stepnes was not a false arrest.

> **b. Warrantless Entry**

Stepnes next argues Ritschel's warrantless entry into the Irving House was improper

because Ritschel did not have consent to enter.

While a warrantless entry into an individual's home to make an arrest is presumptively invalid, <u>Payton v. N.Y.</u>, 445 U.S. 573, 590 (1980), there is no evidence the Irving House was occupied as a home or dwelling.[7]  Thus, the relevant Fourth Amendment analysis is whether Stepnes had a constitutionally protected reasonable expectation of privacy in the Irving House. <u>See</u> <u>California v. Ciraolo</u>, 476 U.S. 207, 211 (1986) ("The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy.").

The expectation of privacy analysis applies a two-part test inquiring first "whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private," and second, "whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable."  <u>Bond v. U.S.</u>, 529 U.S. 334, 338 (2000) (citations and quotations omitted).

 Here, Stepnes's conduct did not exhibit an actual expectation of privacy in the Irving House, because he knowingly exposed the Irving House to the public to promote Contest 1. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  <u>Katz v. U.S.</u>, 389 U.S. 347, 351 (1967).  <u>See also</u> <u>Lewis v. United States</u>, 385 U.S. 206, 211 (1966) (finding that if a home "is converted into a commercial center to which outsiders are invited for the purposes of transacting unlawful business," a government agent "may enter the premises for the very purposes contemplated by the

---

[7] The increased Fourth Amendment protection in an individual's home or dwelling is based on the interest in preserving the privacy and the sanctity of the home.  <u>See</u> <u>Payton</u>, 445 U.S. at 588.  Stepnes resides in Golden Valley, not in the Irving House.  Stepnes Dep. at 14.

occupant.").  Posted signs in the yard and on the door of the Irving House invited the public into the house to play the contest.  The website promoting Contest 1 instructed the public to "[s]imply come to the house at 2857 Irving Avenue South during the open hours posted" to purchase a contest entry.  Id. Ex. 5 at 5.  According to Stepnes, "hundreds of people had been through the house" as of May 28, 2008.  Stepnes Dep. at 212.

Stepnes appears to argue that the sign instructing visitors to "ring bell for entry" exhibited Stepnes's subjective expectation of privacy in the Irving House.  However, the deposition testimony of Stepnes's publicist states that "people could just come in."  Moore Decl. Ex. 14 at 50.

Additionally, even if Stepnes could show an actual, subjective expectation of privacy in the Irving House, he would be unable to satisfy the second inquiry of whether such an expectation was one that society would recognize as reasonable.  No recognition of a reasonable expectation of privacy in the Irving House can be found where the contest website invited visitors to "[s]imply come to the house at 2857 Irving Avenue South during the open hours posted," where hundreds of people had been through the house, and where, in fact, "people could just come in."

Thus, under the circumstances presented, no reasonable jury could find Stepnes had a constitutionally protected interest in privacy in the Irving House, and the officers' entry into the house did not violate Stepnes's Fourth Amendment rights.

### c.      May 29, 2008 Seizure

Stepnes also alleges that he was falsely arrested on May 29, 2008 when he was detained in the back of a squad car while officers searched his home.  However, Stepnes was not

handcuffed or read his Miranda rights and was only temporarily detained while the search warrant was being executed. Therefore, his brief detention did not constitute an arrest. See United States v. Ayala-Vargas, 05-cr-2613RHK, 2006 WL 737972, *2 (D. Minn. March 20, 2006) ("Federal authorities have consistently determined that, absent extraordinary circumstances, there is no arrest where occupants are handcuffed for a detention incident to execution of a search warrant.").

### 3. Excessive Force

Stepnes asserts Ritshel acted under color of state law to deprive Stepnes of his constitutional right to be free from excessive force. "The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998).[8] However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

The Eighth Circuit has held that "a *de minimus* use of force or injury is insufficient to support a finding of a constitutional violation." Crumley v. City of St. Paul, 324 F.3d 1003, 1007 (8th Cir. 2003). "[F]or the application of handcuffs to amount to excessive force there

---

[8] Stepnes's Complaint alleges Defendants' use of excessive force violated the Fourth Amendment and Fourteenth Amendment. The United States Supreme Court has held that excessive force claims involving police officers should be analyzed under the Fourth Amendment's "reasonableness" standard rather than the "substantive due process" approach of the Fourteenth Amendment. Graham v. Connor, 490 U.S. 386, 395 (1989); see also Saucier v. Katz, 533 U.S. 194, 204-05 (2001). Therefore, the Court will confine its analysis of Stepnes's excessive force claim to the Fourth Amendment's reasonableness standard.

must be something beyond allegations of minor injuries." Id. at 1008 (holding as a matter of law that handcuffing resulting in bleeding was not excessive where long term injury was not alleged or supported by medical records). See also Foster, 914 F.2d at 1082 (finding allegation of nerve damage as a result of being handcuffed was "easily disposed of" where plaintiff presented no medical records or evidence of permanent injury to support a claim of excessive force).

Stepnes's excessive force claim is based on the alleged bruising, numbness and soreness in Stepnes's wrists and hands as the result of being handcuffed. The alleged injury is a *de minimus* injury that the Eighth Circuit has found to be insufficient to constitute excessive force, particularly in the absence of medical records. Crumley, 324 F.3d at 1007. Therefore, Stepnes's claim for excessive force fails as a matter of law.[9]

### 4. Unreasonable Search and Seizure

Stepnes also brings a § 1983 claim based on the May 29, 2008 seizure of property from the Irving House, alleging his Fourth Amendment right to be free from unreasonable search and seizure was violated.

#### a. Collateral Estoppel

As a threshold matter, Stepnes asserts that State Court proceedings concerning the return of Stepnes's property collaterally estop the City Defendants from arguing that Ritschel's search of Stepnes's home on May 29, 2008 was proper or that the antique chest is a gambling device.

Under Minnesota law, collateral estoppel serves to bar the relitigation of issues which are identical to issues previously litigated. Pope County Bd. of Comm'rs v. Pryzmus, 682 N.W.2d

---

[9] Stepnes also appears to argue he suffered psychological injury from the arrest. Compl. ¶ 121. However, Stepnes provides no medical records to support this vague assertion. As a result, an excessive force claim premised on this alleged injury also fails.

666, 669 (Minn. Ct. App. 2004). Minnesota courts have set forth a four-factor test for

determining when collateral estoppel applies:

> (1) the issue was identical to one in a prior adjudication; (2) there was a final
> judgment on the merits; (3) the estopped party was a party or in privity with
> a party to the prior adjudication; (4) the estopped party was given a full and
> fair opportunity to be heard on the adjudicated issue.

Illinois Farmers Ins. Co. v. Reed, 662 N.W.2d 529, 531 (Minn. 2003). In Minnesota, collateral

estoppel is not applied rigidly. Rather, its focus is on whether an injustice would be worked

upon the party against whom it is asserted. Falgren v. State Bd. of Teaching, 545 N.W.2d 901,

905 (Minn. 1996).

Here, collateral estoppel does not apply to the State Court ruling because two of the

requisite factors are lacking. First, the issue in the state court proceedings was not identical to

the issues in this action. The focus of the State Court proceedings was Stepnes's demand for the

return of his property based on Stepnes's allegations that 1 ) Stepnes intended to use the seized

items as evidence in a false arrest case against Ritschel, and 2) attorney Clark was prevented

from viewing the items and comparing them with the search warrant at the time the items were

seized. Moore Supplemental Decl. Ex. 2 ("Clark Aff."); Id. Ex. 1 ("Emergency Mot.") at 6.

Stepnes's requested relief in State Court was limited to the return or safekeeping of his property,

and not for findings that Ritschel had violated Stepnes's constitutional rights or a determination

that the antique chest was not a gambling device. See Emergency Mot. at 6. Therefore, the issue

adjudicated in the state court proceedings is not identical to the issue presented here.

Second, the expedited nature of the State Court proceedings did not allow the City

Defendants to fully and fairly litigate whether the seizure of Stepnes's property was

constitutional. Stepnes petitioned for the return of the property the morning of Friday, May 30,

23

and a hearing was held that afternoon.  During the hearing, the Assistant City Attorney for the city of Minneapolis argued, "Your Honor, again, this was served on us at 9:00 o'clock this morning.  The best I can do at this point in time is to come to the Court and say, 'Please give us the time to answer this fully.'"  May 30 Tr. at 17.  In response, Judge Porter stated, "You're not getting your statutory hearing because this is an emergency.  Based on what's been presented to me, this warrant has been exceeded (sic) inappropriately.  And if that's so, Mr. Stepnes is entitled to relief, and he's entitled to the relief now."  Id. at 19.  The City Defendants were given until Monday, June 2, 2008 at 2 p.m. to prepare an inventory of the seized items and "ensure that absolutely everything that was taken was legitimately taken."  Id. at 19-20.  The Monday, June 2 hearing concluded with the oral ruling allowing the MPD to retain one of each of the seized items as an original, photograph certain items, and return the remaining items.  June 2, 2008 Tr. at 28-29.  Thus, the state court proceedings concluded less than two full business days from the time Stepnes filed his petition and did not provide the City Defendants with a full and fair opportunity to litigate the issues related to Stepnes's § 1983 claims and whether the antique chest is a "gambling device."

Because at least two of the elements for collateral estoppel are not satisfied, the State Court proceedings do not have a preclusive effect on this action.

### b.    Unreasonable Search and Seizure Analysis

Stepnes contends the search warrant was 1) unreasonably executed because the items seized exceeded the scope of the warrant, and 2) particularly destructive because the spillage of fasteners during the seizure destroyed the integrity of the contest.  Defendants argue the seizure of Stepnes's property related to the illegal lottery and was not unnecessarily destructive.

### i. Scope of Warrant

Stepnes argues the search and seizures at the Irving House were performed with the improper purpose of terminating Contest 1. Stepnes also contends the seizure of the antique chest, the newly purchased tape recorder, the yard sign, Stepnes's computers, a business card from a therapist, and a business card from Barrett, exceeded the scope of the search warrant and were therefore improperly seized. The City Defendants respond that the items seized were within the scope of the search warrant and were properly seized as evidence of a crime.

"The [F]ourth [A]mendment requires that a search warrant's description of the evidence to be seized be 'sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized." United States v. Frederickson, 846 F.2d 517, 519 (8th Cir. 1988) (quoting United States v. Muckenthaler, 584 F.2d 240, 245 (8th Cir. 1978)). Additionally, "[l]aw enforcement officials must have probable cause to believe that items seized in connection with a valid warrant are associated with criminal activity." Walden v. Carmack, 156 F.3d 861, 873 (8th Cir. 1998). Probable cause does not require a police officer to be certain, but demands "only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.'" Id. (quoting United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997)).

The search warrant authorized the search of "2857 Irving Av S," including, *inter alia*, "yard areas surrounding and/ or related to the property," and described the evidence to be seized as:

> Physical records related to unlawful lottery, 2857Irving.com "Win this house", including but limited to, all documentation, notes,

> tickets, signage, postings;
>
> Electronic records related to unlawful lottery, 2857irving.com "Win this House," including but not limited to computers, hard drives, electronic data storage devices, website information and documentation;
>
> Gambling related devices and paraphernalia;
>
> Financial records and documentation related to 2857irving.com "Win this House";
>
> Financial records and documentation related to Paul Stepnes;
>
> Records and documentation related to alleged non-profit organization- Chester House Foundation

Moore Supplemental Decl. Ex. 2 at Ex. F.

The search warrant was sufficiently definite in identifying the objects to be seized; namely, physical and electronic records and paraphernalia related to a lottery. Additionally, based on Ritschel's review of the website, probable cause existed to believe the items to be seized were evidence of an illegal lottery. Therefore, the scope of and purpose for the search warrant were proper.

As analyzed below, the execution of the search warrant was also proper, because the items seized were mentioned in the warrant or reasonably related to the illegal lottery. See Taylor v. State of Minn., 466 F.2d 1119, 1121 (8th Cir. 1972) ("If the warrant itself was not so broad as to constitute a general search, then an item not mentioned in the warrant may be seized if the item is reasonably related to the crime for which the warrant issued.").

### a. Antique Chest

Stepnes argues the chest was not a "gambling related device." However the search warrant specifically authorized seizure of "gambling related devices and paraphernalia." The

26

chest meets the statutory definition of a gambling device because it was used as "a contrivance the purpose of which is that for a consideration a player is afforded an opportunity to obtain something of value . . . the award of which is determined principally by chance."[10]  Minn. Stat § 609.75, subd. 4.  Therefore, seizure of the chest was proper.

### b.    Tape Recorder

Ritschel seized a new and unpackaged tape recorder based on his belief that it was to be used as a prize in the weekly drawings.  See June 2, 2008 Tr. at 5.  As such, the tape recorder

---

[10] The awards in the contests devised by Stepnes were determined principally by chance. A game is considered one of chance if chance predominates over skill indetermining the  game's winner.  United States v. Twenty-Eight "Mighty Payloader" Coin Operated Gaming Devices, 623 F.2d 510,514 (8th Cir. 1980); City of St. Paul v. Stovall, 30 N.W.2d 638, 641-42 (Minn. 1948).  A game may be considered one of chance even where skill plays some role in a participant's success.  United States v. Korpan, 354 U.S. 271, 273-74 (1957) (finding pinball machines to have a sufficient element of chance to meet the definition of a gambling device even though "skill may have had some part in playing them successfully.").  The Minnesota Attorney General has determined that a guessing game is considered a game of chance where "there could be no fixed and definite fact or quantity upon which to base a mathematical calculation or demonstration."  Sullivan Decl. Ex. 52 (Op. Minn. Atty. Gen. Feb. 6, 1950 (citing Hudelson v. State, 94 Ind. 426, 427-28 (1884)).
Contest 1 was a game of chance because several factors dictated that chance predominated over skill in determining the number of fasteners in the chest.  First, the items visible to contestants were not representative of the trunk's contents, due to the variety of fasteners contained in the chest and the wide range in the items' shapes and sizes.  The smaller items would likely have sifted to the bottom of the chest, and some varieties of fasteners may not have been viewable from the surface.  Without knowing the size and shape of the non-viewable fasteners, the ratio of fastener types contained in the chest, or the undisclosed fact that a cardboard box and plastic sheet were also inside the chest, a contestant would have "no fixed and definite fact or quantity upon which to base a mathematical calculation or demonstration."  Id. Contest 2 was also a game of chance because, as with Contest 1, not all varieties of fasteners may have been viewable by a contestant, and the ratio of the fasteners was not disclosed.
Stepnes argues that similar guessing contests, such as guessing the number of ping pong balls in a car, have been considered to be valid because the number of items in question can be accurately calculated using physics, mathematics, or computer programs.  However, unlike Contests 1 and 2, the items involved in the guessing contests relied on by Stepnes were uniform objects that were known by or visible to a contestant, thus allowing for a "fixed and definite fact or quantity upon which to base a mathematical calculation or demonstration."  Id.

was properly seized as an item reasonably related to the illegal lottery.

### c. Yard Sign, Computers, Documents

The yard sign, paper documents, and computers were also properly seized as physical and electronic records reasonably related to the unlawful lottery.[11] Further, the yard sign, computers, and documents (including business cards) were specifically mentioned in the warrant, and thus properly within the scope of the search.

### ii. Manner of Execution

Stepnes also contends the manner in which the search was executed was particularly destructive because the spilling of the nails made it impossible for Stepnes to determine the number of items that had been in the trunk, requiring Contest 1 to be cancelled.

"It is elementary Fourth Amendment law that even valid warrants must be executed in a reasonable manner." Hummel-Jones v. Strope, 25 F.3d 647, 653 (8th Cir. 1994). "The manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness." Id., 25 F.3d at 650.

Stepnes has presented no evidence that the execution of this search warrant "traverse[d] the general Fourth Amendment proscription against unreasonableness." Id., 25 F.3d at 650. The

---

[11] Stepnes contends the MPD's viewing of the hard drive information exceeded the scope of the search, in violation of Judge Porter's oral order that the hard drives not be viewed until authorized. However, the search warrant specifically authorized the search and seizure of computers and hard drives. Moreover, Judge Keyes's February 18, 2010 Report and Recommendation specifically found that Ritschel's misconduct did "not relate to the matters in controversy in this case – i.e., his . . . violation of Judge Porter's order ha[d] nothing to do with whether [Stepnes] suffered a false arrest in violation of his Fourth Amendment rights." Id. at 15. Thus, the hard drive issue will not be revisited in the analysis of Stepnes's § 1983 claims.

evidence is that at least some of the fasteners spilled through a crack in the bottom of the chest when the officers began to lift it. Thus, the spillage naturally resulted from the existing crack in the chest and not from any purposeful damage by the police officers. Additionally, Ritschel could have reasonably assumed that Stepnes had counted the items at the time they were poured into the trunk, and thus that Contest 1 would be impacted by the spilling of the nails was not reasonably forseeable.

Because the search and seizure of property at the Irving House was reasonable in scope and execution, the City Defendants are granted summary judgment as to this claim.

**C.** **Section 1983 Claims Against City of Minneapolis**

Using the factual predicate as alleged against Ritschel, Stepnes alleges a Monell claim against the City of Minneapolis. As a general matter, municipalities are not subject to respondeat superior or vicarious liability under § 1983. Monell v. New York City Dep't. of Social Servs., 436 U.S. 658, 694 (1978). However, a municipality can be held liable for its own wrongs when the enforcement of a policy or practice of the municipality results in the deprivation of federally protected rights. Id. at 694. To demonstrate Minneapolis's liability under a Monell claim, the Plaintiff must show that a policy or custom of Minneapolis was the "moving force [behind] the constitutional violation." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citation omitted).

Here, the Monell claim fails because Stepnes's Complaint does not establish a constitutional violation by Ritschel, and therefore no § 1983 municipal liability can apply. Hayek v. City of St. Paul, 488 F.3d 1049, 1055 (8th Cir. 2007) (citing Monell, 436 U.S. at 694). Additionally, Stepnes had failed to present facts or a legal argument to show that a policy or

custom served as a moving force behind a constitutional violation.

**D.      Section 1985 and 1986 Claims Against City Defendants**

Stepnes alleges the City Defendants "acted alone and/or together (2 or more in concert), and one or more of them committed some act in furtherance of the conspiracy to violate Plaintiff's rights (and Plaintiff  was damaged)."  Compl. ¶ 120.  Although the claim is alleged as a § 1983 claim, it is more appropriately analyzed as a conspiracy claim under 42 U.S.C. §§ 1985 and 1986.  The City Defendants move for summary judgment, urging that Stepnes's conspiracy claim lacks merit.

A conspiracy claim under §§ 1985 and 1986 requires a showing of the following elements: (1) that the defendant conspired with others to deprive him or her of a constitutional right; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff.  Askew v. Millerd, 191 F.3d 953, 957 (8th Cir. 1999).  To succeed in proving a § 1985 conspiracy claim, a plaintiff "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement."  Omaha Employees Betterment Ass'n v. Omaha, 883 F.2d 650, 652 (8th Cir. 1989).  In satisfying this burden, the plaintiff must recite "at least some facts which would suggest that the [alleged conspirators] 'reached an understanding' to violate [his] rights."  Nelson v. City of McGehee, 876 F.2d 56, 59 (8th Cir. 1989) (quoting Myers v. Morris, 810 F.2d 1437, 1454 (8th Cir. 1987), cert. denied, 848 U.S. 828 (1988)).

Although Stepnes claims the City Defendants conspired to deprive him of his constitutional rights, as previously discussed, Stepnes has failed to demonstrate he was, in fact, deprived of a constitutional right.  Even if Stepnes could establish a constitutional violation, he

has not presented evidence or a legal argument to support an overt act committed by one or both of the City Defendants in furtherance of the alleged conspiracy. See Barstad v. Murray County, 420 F.3d 880, 887 (8th Cir. 2005) ("A conspiracy claim requires evidence of specific facts that show a 'meeting of minds' among conspirators."). In fact, the Complaint does not identify the co-conspirators, leaving the Court to guess as to whose minds may have met and what the alleged conspiracy may have entailed. The Complaint arguably implies a conspiracy between Ritschel and Murphy by asserting: 1) Ritschel "presumably" supplied Murphy with information used in the broadcast; 2) Murphy may have been "unwittingly used by Ritschel to foster their agenda;" and 3) Murphy "acted as a type of 'agent' for Sgt. Ritschel." Compl. ¶¶ 81, 83, 90. These conclusory allegations fail to satisfy the requirement that a plaintiff "allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." Omaha Employees Betterment Ass'n, 883 F.2d at 652.

Because Stepnes's § 1985 claim fails, his claim under § 1986 also fails, because a valid § 1985 case must be established before a § 1986 action can stand. Gatlin v. Green, 362 F.3d 1089, 1095 (8th Cir. 2004).

**E.    Intentional Interference with Contract Claim Against Ritschel**

The City Defendants assert that the intentional interference with a contract claim did not survive the dismissal of the Non-Stepnes Plaintiffs. In the alternative, the City Defendants move for summary judgment on this claim, arguing that Stepnes cannot satisfy the claim's requisite elements. As discussed in Section II.J. above, Count III of the Complaint alleging intentional interference with a contract is not viable after the voluntary dismissal of the Non-Stepnes Plaintiffs.

Moreover, assuming, *arguendo*, the tortious interference claim remains, the claim would nevertheless fail because Stepnes cannot satisfy the elements required to prevail on the claim. The elements for a cause of action under intentional interference with a contract are: 1) the existence of a contract; 2) the alleged wrongdoer's knowledge of the contract; 3) intentional procurement of its breach; 4) without justification; and 5) damages. Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994) (citing Furley Sales and Assoc., Inc. v. North American Automotive Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982)). A plaintiff must satisfy each of the five elements to prevail on the claim. Bebo v. Delander, 632 N.W.2d 732, 738 (Minn. Ct. App. 2001) (citation omitted).

Stepnes cannot satisfy the first element, because Contest 1 was an illegal lottery, and thus Stepnes's contracts with the contestants were unenforceable as a matter of law. See United Steel Workers of Am. Local 6115 v. Quadna Mountain Corp., 435 N.W.2d 120, 122 (Minn. Ct. App. 1989) ("If a contract transgresses law or public policy, it is void."). Accordingly, even if a claim for intentional interference with a contract survived previous dismissal of claims, the claim would nevertheless fail now.

## F. Qualified and Official Immunity

Assuming Stepnes has proffered sufficient evidence on any of his claims against Ritschel, the City Defendants' Motion must be granted on the basis of qualified and official immunity.

### 1. Qualified Immunity

Under well established law, federal qualified immunity shields an officer from a suit for damages if a reasonable officer could have believed his or her conduct to be lawful under clearly established law and the information he or she possessed. Hunter v. Bryant, 502 U.S. 224, 227

(1991) (citation omitted). Government officials are entitled to qualified immunity "if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Sanders v. City of Minneapolis, 474 F.3d 523, 526 (8th Cir. 2007) (quotations omitted). "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law." Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994).

The standard for assessing qualified immunity is one of "objective legal reasonableness." Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (citing Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). The first question is whether, viewing the facts in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part, Pearson v. Callahan, 129 S.Ct. 808, 818 (2009). If the first question is answered in the affirmative, the second question is whether the right violated was clearly established.[12] Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action." Winters, 254 F.3d at 766.

The Court has concluded that Stepnes's arrest and the May 29, 2008 search of the Irving House were objectively reasonable and did not violate Stepnes's constitutional rights. However, assuming, *arguendo*, Ritschel's conduct during these events was not objectively reasonable, it

---

[12] In Pearson, the Supreme Court ruled that courts have the discretion to choose to evaluate the second question before deciding the first question. See Pearson, 129 S.Ct. at 818.

was not so unreasonable that "it is obvious that no reasonably competent officer would have concluded that [Ritschel] should have not have taken the action" complained of by Stepnes.  Id. As a result, Ritschel is entitled to qualified immunity with respect to Stepnes's § 1983 claims for false arrest and unreasonable search and seizure relating to the May 29, 2008 execution of the search warrant.  Similarly, with regard to Stepnes's other federal claims against Ritschel, Stepnes has failed to show a constitutional violation, and even if he had, Stepnes has not shown that it was "obvious that no reasonably competent officer would have concluded that [Ritschel] should have taken the disputed action" alleged in those claims.  Id.

### 2.    Official Immunity

Any state law claims alleged by Stepnes against Ritschel also fail, because such claims are barred by the Minnesota common law doctrine of official immunity.  The doctrine provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong."  Elwood v. Rice County, 423 N.W.2d 671, 677 (Minn. 1988).   Under Minnesota law, public officials are entitled to official immunity unless the plaintiff can show either of two exceptions apply: 1) a ministerial duty is either not performed or performed negligently, or 2) a willful or malicious wrong is committed.  Schroeder v St. Louis County, 708 N.W.2d 497, 505 (Minn. 2006) (citing Anderson v. Anoka Hennepin Indep. Sch. Dist. 11, 678 N.W.2d 651, 662 (Minn. 2004)).

Stepnes cannot satisfy the first exception to official immunity, because duties of law enforcement and crime prevention by police officers are discretionary duties entitling them to official immunity.  Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990).  To satisfy the second

exception, that a willful or malicious wrong was committed, Stepnes must present specific facts showing Ritchel intentionally and knowingly committed a wrongful act without legal justification or excuse.  Elwood, 423 N.W.2d at 679; Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991).  Stepnes has failed to identify specific facts showing Ritschel committed a willful or malicious wrong.  His actions in arresting Stepnes and executing the search warrant at the Irving House were based on and justified by his probable cause belief that an illegal lottery was being conducted.  Accordingly, the doctrine of official immunity bars any state law claims Stepnes asserted against Ritschel.

In sum, viewing the evidence in the light most favorable to Stepnes, the Court determines that, with regard to Stepnes's claims against the City Defendants, Stepnes has failed to show the existence of specific facts that would create a genuine issue for trial.

## G.    Defamation Claim Against CBS Defendants

Stepnes's defamation claim against the CBS Defendants is premised upon an allegation that the statements made by Murphy in the WCCO broadcast were false and defamatory.  The CBS Defendants have moved for summary judgment, arguing the evidence does not satisfy the requisite elements for a defamation claim.

In Minnesota, the elements of a cause of action for defamation include: 1) a false and defamatory statement about the plaintiff; 2) an unprivileged publication to a third party; 3) a tendency to harm the plaintiff's reputation in the community; and 4) fault amounting to at least negligence.  Britton v. Koep, 470 N.W.2d 518, 520 (Minn. 1991).  If the plaintiff cannot satisfy all elements of defamation, his claim fails.

1.     **Fault Standard**

The CBS Defendants first argue that Stepnes cannot satisfy the fourth element, which is the element of "fault."

The standard to be applied for determining fault under a defamation claim depends on a plaintiff's private or public status.  Id. at 520; Jadwin v. Minneapolis Star & Tribune Co., 367 N.W.2d 476 (1985).  In Minnesota, a private individual plaintiff satisfies the element of fault by showing the defendant was merely negligent in making a false statement.  Britton, 470 N.W.2d at 520; Jadwin, 367 N.W.2d at 491-92.  However, plaintiffs who are public officials or public figures must prove with clear and convincing evidence that the defendant acted with *actual malice* when making the statement. Britton, 470 N.W.2d at 520 (citing New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)); Chafoulias v. Peterson, 668 N.W.2d 642, 648-49 (Minn. 2003).

Public figures are classified into three categories: 1) rare "involuntary" public figures; 2) celebrities and persons assuming prominent roles in the affairs of society; and 3) limited purpose public figures who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" and who "invite attention and comment." Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).  Individuals falling within in these public figure categories are required to show a higher level of fault than purely private plaintiffs because: 1) public figures "usually enjoy significantly greater access to the channels of effective communication" and are thus better able to counter false statements and protect themselves from the harm caused by defamatory speech; id. at 344; and 2) public figures "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them."  Id.

at 345. "The public or private status of the plaintiff in a defamation action is a question of law."[13] Britton, 470 N.W.2d at 524 (citing Jadwin, 367 N.W.2d at 483); Bagley v. Iowa Beef Processors, Inc., 797 F.2d 632, 644 (8th Cir. 1986); Lundell Mfg. Co. v. Am. Broad. Cos., Inc., 98 F.3d 351, 362 (8th Cir. 1996).

### a.    Limited Purpose Public Figures

The CBS Defendants urge that Stepnes's involvement in the public controversy surrounding the contests makes him a limited purpose public figure. In determining whether a plaintiff is a limited purpose public figure, a court must 1) identify the particular public controversy giving rise to the defamatory speech, 2) examine the nature and extent of the plaintiff's involvement in the controversy. Bagley, 797 F.2d at 645; Lundell, 98 F.3d at 363; Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1119-20 (8th Cir. 1999). The Minnesota Supreme Court includes a third factor in the analysis, requiring a court to 3) determine whether the alleged defamatory statements related to the public controversy. Chafoulias, 668 N.W.2d at 651.

### i.    Public Controversy

"A public controversy is a dispute that 'has received public attention because its ramifications will be felt by persons who are not direct participants.'" Chafoulias, 668 N.W.2d at 651, (quoting Waldbaum v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980)); see also Bagley, 797 F.2d at 645 (defining public controversies as "those controversies raising issues

---

[13] The Minnesota Supreme Court recognizes that some cases require resolution of fact issues before this question of law may be answered. Chafoulias, 668 N.W.2d at 649-51. Here, however, the relevant facts regarding whether Stepnes is a limited purpose public figure are not disputed.

that might reasonably be expected to have an impact beyond the parties directly enmeshed in the particular controversy.").  "In isolating the pubic controversy, courts look to those controversies that are already the subject of debate in the public arena at the time of the alleged defamation."[14] Chafoulias, 668 N.W.2d at 652.

Here, the dispute being debated in the public arena at the time of the broadcast was the legality of the home giveaway contest purporting to benefit homeless women and children. Integral to that debate were Stepnes's corresponding allegations of police misconduct.

The ramifications of the dispute impacted others not directly involved in the controversy. The contest was offered to the general public, and the contest's legality impacted current and potential contestants who understood that their payment of the $20 entry fee would result in the opportunity to win a prize and benefit the homeless.  Additionally, the legality of the contest impacted local homeless women and children, because the contest's stated goal was to pay off the mortgage of a shelter for homeless women and children.  Further, as Stepnes himself stated, the lawfulness of the contest impacted homeowners who may have chosen to conduct similar contests, as well as others in the real estate industry who purchased foreclosed properties at diminished prices.  See Compl. ¶ 21 ("Stepnes did not view this as just about the Irving House.

---

[14] Here, the public controversy was being debated in the public arena before the CBS Defendants aired their broadcast.  Courts will not apply limited purpose public figure status to plaintiffs in instances where the defendant's defamatory statements created the controversy.  See Wolston v. Readers Digest Ass'n, 443 U.S. 157, 167-68 (1979) (finding plaintiff took no voluntary action in the controversy where defendant's defamatory statements created the conduct and thrust plaintiff in the public eye); Chafoulias, 668 N.W.2d at 653 (finding plaintiff's responses to a public controversy elevated him to a limited public purpose figure as to the defendant reporting on the controversy, but not as to defendant that created the controversy); Jadwin, 367 N.W.2d at 485 ("[T]hose charged with defamation cannot by their own conduct create their defense by giving the claimant public figure status.").

Rather, Stepnes realized that significant players in the real estate industry might feel threatened – what if other homeowners decided to have such a contest?").  This impact had the potential to be particularly significant during an economic downturn and rising foreclosure rates occurring at the time the contest's legality was being debated.  Finally, Stepnes's allegations of police misconduct held ramifications that extended beyond Stepnes and the MPD because police misconduct is a public concern.  See e.g. Chafoulias, 668 N.W.2d at 652 (finding the public debate over whether law enforcement was properly investigating allegations of sexual harassment to be a public controversy); Lundell, 98 F.3d at 363 (finding a county's garbage disposal problem to be a controversy involving questions of public concern).

### ii.      Nature and Extent of Stepnes's Role in the Public Controversy

Having found a public controversy, the Court must next determine the "nature and extent" of  Stepnes's involvement by examining whether Stepnes "thrust [himself] to the forefront" of the public controversy "in order to influence the resolution of the issues involved." Bagley, 797 F.2d at 645 (quoting Gertz, 418 U.S. at 345).  Factors relevant to this analysis include whether Stepnes: 1) voluntarily participated in the public controversy, 2) played a prominent role in the debate; and 3) had access to channels of effective communication to counteract false statements.  Gertz, 418 U.S. at 344-45; Chafoulias 668 N.W.2d at 653.

### a.      Voluntary Participation

A plaintiff's voluntary participation in a public controversy is indicative of a plaintiff inviting attention and comment rather than being "dragged unwillingly into the controversy." Wolston, 443 U.S. at 166.  Here, the undisputed evidence shows that Stepnes willingly and repeatedly injected himself into the public controversy by discussing the issues with local

journalists.  See, e.g., Sullivan Decl. Ex. 33 (Ray Neset, <u>Killing the Dream PT 1</u>, MPLS Mirror, June 2, 2008) (stating "Paul was very open . . . to discussing the situation in which he currently finds himself."); <u>Id.</u> Ex. 36 (Ray Neset, <u>Killing the Dreams Day in Court PT 2</u>, MPLS Mirror, June 3, 2008) (describing Stepnes's willingess to discuss his situation, his anger over police conduct, and his view that the contest was a legal game of skill that could be a "win-win" for everyone); <u>Id.</u> Ex. 39 (Dylan Thomas, <u>Following arrest, Dream Home contest continues</u>, Southwest Journal, July 14, 2008) (quoting Stepnes as saying "I think people have the perception they're doing something illegal when they come here, and nothing could be farther from the truth.").  Accordingly, the Stepnes's participation in the public controversy was voluntary.

### b.        Prominent Role in the Debate

Stepnes's prominent role in the controversy is shown in numerous news articles which promote his position in the controversy and effort to influence the outcome of the dispute.  <u>See, e.g.</u>, Sullivan Decl. Ex. 29 (Dylan Thomas, '<u>Dream House' builder arrested</u>, Southwest Journal, May 28, 2008) (quoting Stepnes as explaining the contest "is a game of skill . . . It's not a game of chance, and I think that's the thing people need to understand."); <u>Id.</u> Ex. 33 (Neset, <u>Killing the Dream PT 1</u>) ("While it seems police think that Paul was charging for the weekly give-away prize, . . . Paul made it quite clear that the weekly giveaway was free to participants. . . . They also told me that there is no situation here of anyone trying to 'pull a fast one. . . . Stepnes highly doubts that Ritschel disclosed to the warrant-issuing judge that he [Ritschel] was worried he would be sued for false arrest on 5/28."); <u>Id.</u> Ex. 36 (Neset, <u>Killing the Dreams Day in Court PT 2</u>) ("Paul revealed that the police had hauled away the trunk . . . and it seemed they spilled some of the contents out onto the floor . . . Suspicion was voiced that the police knew very well that

this would compromise the drawing."); Id. Ex. 39 (Thomas, <u>Following Arrest, Dream Home</u>

<u>contest continues</u>) (conveying Stepnes's belief that "the Minneapolis Police are largely

responsible for the failure of the first contest.").

Stepnes now urges that he was merely defending himself against police allegations, and

thus should not be deemed a public figure. However, Stepnes did not limit his role in the

controversy to simply denying the allegations against him. He also discussed the merits of his

position and raised allegations of police misconduct. As such, his participation in the public

controversy is distinguishable from cases where a plaintiff's mere denial of wrongdoing did not

elevate the plaintiff to a public figure. <u>See</u>, <u>e.g.</u>, <u>Wolston</u>, 443 U.S. at 168 (finding plaintiff's

activity did not elevate him to limited purpose public figure status where his involvement in the

controversy was limited to defending contempt charges and he did not discuss the matter with

the press).

### c. Access to Effective Channels of Communication

Not only did Stepnes play a voluntary and prominent role in the public controversy, he

readily accessed effective channels of communication, including "local press, a website, Internet,

YouTube, media consultants, [and] PR people." Stepnes Dep. at 51. By Stepnes's own

description, the media coverage of the public controversy provided Stepnes with an opportunity

to counteract the damage that resulted from being arrested while a reporter was present:

> The Star Tribune had printed an article that was balanced, and (I
> thought), showed police to be silly. It quoted Tom Barrett from the
> Gambling Control Board, confirming that he *had* told me that the
> contest I had in mind was a game of skill - and therefore not illegal
> gambling. Also, the Minneapolis Mirror had done a piece that
> portrayed the situation (I thought) in my favor. And, the Southwest
> Journal, which had run the first article about my arrest, did a second
> article, that was balanced, and presented a lot of positive (I thought)

about the contest.

Stepnes Decl. [Docket No. 271] at ¶ 22.  Stepnes also "hired new PR people who promised they would not quit if the going got tough, but would hang in there to shape the message."  Stepnes Decl. at ¶ 22.  Under these circumstances, Stepnes "met the rationale of access to rebut the alleged libelous publication that is a distinguishing feature between private individuals and public figures."  Jadwin, 367 N.W.2d at 486.

Stepnes counters that he sought media exposure to obtain free advertising, and therefore should not be elevated to public figure status.  However, Stepnes's media involvement went beyond the "necessary and routine" solicitation of business that, without more, will not automatically transform plaintiff into a limited purpose public figure.  See Jadwin, 367 N.W.2d at 486 (finding plaintiff's use of media to solicit public investment in bond fund was a routine activity for one in his profession and did not elevate him to public figure status).  Stepnes used the media to promote his theories as to why the contest was legal, as well as his allegations that police had abused their authority.

### iii.    Statements Related to Existing Public Controversy

The third factor is whether the subject of the broadcast and the allegedly defamatory statements related to the public controversy being debated in the media.  Chafoulias, 668 N.W.2d at 654.  The broadcast discussed allegations by the police that the contest was illegal, and included Stepnes's contention that the contest was a legal game of skill.  Although the broadcast incorrectly stated Stepnes was arrested for violating charitable gambling laws, rather than conducting an illegal lottery, the public debate included the charitable goal of the contest and the issue of whether the Chester House Foundation existed as a charitable organization.  See

42

Sullivan Decl. Ex. 39 (Southwest Journal article, July 14, 2008) (quoting Stepnes's counsel as stating: "The fact that the 501(c)(3) paperwork wasn't completed yet doesn't mean a company didn't exist."). Additionally, the statements in the broadcast that the Irving House was in foreclosure related to topics already being discussed in the existing public controversy. See Id. Ex. 36 (MPLS Mirror June 3, 2008 article) ("At this time, the house is in foreclosure . . . That may be part of what this is all about, since it seems many people want the house for below its value. . . . [Stepnes] does have a benefactor who has offered to step up and take care of the issue so that Paul will not lose his investment."). Thus, the third factor is satisfied.

In summary, the undisputed evidence shows that Stepnes "thrust [himself] to the forefront of [the] particular public controvers[y] in order to influence the resolution of the issues involved," and "invite[d] attention and comment." Gertz, 418 U.S. at 345. Moreover, the statements in the broadcast related to the public controversy in which Stepnes voluntarily and actively participated. As a result, Stepnes is a limited purpose public figure as he presents his defamation claim against the CBS Defendants.

### 2. Application of Actual Malice Standard

Having determined Stepnes is a limited purpose public figure, he must prove actual malice to prevail on his defamation claim. The actual malice standard requires a plaintiff to prove by clear and convincing evidence that a challenged statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964). To show "reckless disregard," a plaintiff must prove the defendant made the statement "while subjectively believing that the statement [was] probably false." Chafoulias, 668 N.W.2d at 655. The evidence must be sufficient "to permit the

43

conclusion that the defendant in fact entertained serious doubts as to the truth of [the]

publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). As such, "[m]alice is more

than mere negligence and probably even more than highly unreasonable conduct." Franzwa v.

City of Hackensack, 567 F. Supp. 2d 1097, 1111 (D. Minn. 2008) (alteration in the original)

(internal quotations omitted). "The question of whether the evidence in the record in a

defamation case is sufficient to support a finding of actual malice is a question of law." Britton,

470 N.W.2d at 524; Franzwa, 567 F. Supp. 2d at 1111.

The issue of whether Stepnes can show actual malice was addressed by Judge Keyes in

denying Stepnes's motion to amend the First Amended Complaint to add punitive damages.

Order, April 13, 2010 [Docket No. 247] ("Order"). Judge Keyes observed that "the

constitutional 'actual malice' standard does not differ in any meaningful way from the

'deliberate disregard' standard for obtaining punitive damages under in the context of a

defamation action." Order at 10. Judge Keyes also recognized that "the First Amendment

precludes an award of punitive damages absent proof of actual malice." Id. at 11, (citing Gertz

418 U.S. at 349 ("States may not permit recovery of presumed or punitive damages, at least

when liability is not based on a showing of knowledge of falsity or reckless disregard for the

truth.") and Jadwin, 367 N.W.2d at 492 ("Plaintiff must prove actual malice on the part of the

defendant to recover punitive damages.")). After thoroughly analyzing Stepnes's unrebutted

evidence, Judge Keyes determined that Stepnes had "failed to present a *prima facie* showing of

clear and convincing evidence that the CBS Defendants deliberately disregarded his rights." Id.

at 14. This Court affirmed Judge Keyes's decision on the merits. Mem. Opinion and Order,

June 16, 2010 [Docket 257] at 5-6.

Therefore, because Stepnes is a limited purpose public figure who cannot establish a *prima facie* showing that the CBS Defendants acted with actual malice, his claim for defamation fails.  The CBS Defendants are granted summary judgment.

**H.     Intentional Interference with Contract Claim Against CBS Defendants**

As discussed in Section II.J. above, Count III of the Complaint alleging intentional interference with a contract cannot survive after dismissal of the Non-Stepnes Plaintiffs.

Moreover, assuming, *arguendo*, the Count III claim against the CBS Defendants remains, it is subject to a *sua sponte* grant of summary judgment.  A court's grant of summary judgment *sua sponte* is proper "where the 'party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted.'" Madewell v. Downs, 68 F.3d 1030, 1049 (8th Cir. 1995) (quoting Shur-Value Stamps, Inc. v. Phillips Petroleum Co., 50 F.3d 592, 594 (8th Cir. 1995) (quoting, in turn, Interco Inc. v. National Sur. Corp., 900 F.2d 1264, 1269 (8th Cir. 1990)).

Here, had Stepnes alleged a claim against the CBS Defendants for intentional interference with a contract, it would have been based on the same factual allegations as the intentional interference with a contract claim Stepnes would have asserted against the City Defendants.  See Compl ¶¶ 130-34.  Stepnes had sufficient notice and an opportunity to show why summary judgment should not be granted as to the tortious interference claim, because he argued the merits of the claim in response to the City Defendants' summary judgment motion. There, the Court determined that even if the claim against the City Defendants had survived dismissal of the Non-Stepnes Plaintiffs, it would nevertheless fail on summary judgment because Stepnes could not satisfy the claim's first element requiring the existence of a contract.  See

Section III.E, <u>infra</u>. A tortious interference claim by Stepnes against the CBS Defendants would fail for the same reasons. Therefore, granting summary judgment *sua sponte* in the CBS Defendants' favor would be proper. <u>See</u> <u>Chrysler Credit Corp. v. Cathey</u>, 977 F.2d 447, 449 (1992) (finding where a non-moving party's entitlement to judgment turned on the same issue as a moving party's entitlement to judgment, and judgment was awarded to the moving party, the district court's *sua sponte* entry of summary judgment in favor of the non-moving party was proper).

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff's Motion for Partial Summary Judgment [Docket No. 309] is **DENIED;**

2.    the City Defendants' Motion for Summary Judgment [Docket No. 312] is **GRANTED;** and

3.    the CBS Defendants' Motion for Summary Judgment [Docket No. 315] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

                                                  BY THE COURT:


                                                  _____s/Ann D. Montgomery_____
                                                  ANN D. MONTGOMERY
                                                  U.S. DISTRICT JUDGE

Dated:  January 12, 2011.